ARMITAGE *v.* MORRIS, ADMINISTRATOR.

4-8836                                        221 S. W. 2d 9

Opinion delivered May 9, 1949.

Rehearing denied June 27, 1949.

*Gordon Armitage,* for appellant.

*Owen C. Pearce* and *Culbert L. Pearce,* for appellee.

GRIFFIN SMITH, Chief Justice. A direct appeal by Armitage is from a judgment that as attorney he retained as a fee $379.28 more than the charge should have been for services rendered Louis Lexton Morris in two transactions involving an estate. Armitage has also appealed from dismissal of his cross-complaint against Morris, Owen C. Pearce, and Culbert L. Pearce, alleging damages for defamation of character. Morris has cross-appealed from the judgment allowing Armitage compensation in any sum, and from the Court's refusal to hold that in remitting $1,896.81 to Cox & Company without his client's authority, Armitage converted the fund.

Walter B. Morris died in California in November 1943. His nearest of kin were a brother and a sister:

Ann Dye and Louis Lexton Morris. For many years Louis and Ann had resided in White County, near Searcy, Arkansas, and neither knew where Walter was; nor were they informed of his death. Ann died in January 1944, unmarried and without issue. Louis was appointed Administrator January 26, 1944. His only report, approved February 23, 1945, disclosed net assets of $3,898, which went to Louis by descent and distribution. The Court's order of approval discharged the administrator and the United States Fidelity and Guaranty Company "of all liability on the bond executed by said Administrator."

In May 1946 W. C. Cox & Company, a corporation domiciled in Chicago, wrote Louis that his brother Walter had died "in a West Coast city," leaving a valuable estate. The suggestion was that for a share in the net proceeds the corporation would bring about a settlement of the estate, otherwise the assets would escheat.

Morris, after conferring with Armitage, contracted with Cox & Company on a contingent basis, the corporation to receive forty percent of the net estate. Armitage says that when this agreement was made a Cox representative was present, and prepared a separate contract for Morris to sign under which the attorney would receive five percent, payable by Morris. He protested that the amount was insufficient, but left the matter for later determination.

In August the Superior Court for Los Angeles County, California, required information regarding Ann Dye Morris, whose estate was shown to be in process of administration. As a result of further discussions with Morris, Armitage procured from the Probate Clerk at Searcy a certificate that Lewis Lexton Morris as Administrator had not been discharged. In February 1947 the Public Administrator for Los Angeles County sent the Cox Company two checks, each for $4,742.03: one payable to Morris personally, the other to him as Administrator. They were dated February 13.

It is contended by Armitage that when complications arose regarding what would have been the dis-

tributive share of Ann if she had lived, Morris agreed to pay him ten percent of the net amount of Walter's estate, and also told him to go ahead and handle the collections as his best judgment suggested.

When Cox received the California checks, the one payable to Morris was indorsed under power of attorney, and the Company's check for sixty percent was sent to Armitage—$2,845.22. Cox sent the other California check to Armitage without indorsement.

Armitage indorsed, "L. L. Morris, Gordon Armitage, Attorney," and deposited to his own credit in a Searcy bank the Cox check for $2,845.22, and on March 8, 1947, caused Morris to execute a form reading: "Received of Gordon Armitage $4,742.04—Security Bank deposit 3-6-47, $2,371.02, and cash in the sum of $2,371.02, the receipt of which is hereby acknowledged."

Actually, Armitage had deposited to the credit of Morris' account $2,371.02, and the difference of $474.20 was subsequently claimed by him as ten percent on the California payment of $4,742.02.

There remained the second California check. On March 3d—five days before the receipt from Morris was dated—Armitage sent to Cox his personal check for $1,896.81, representing forty percent of the Ann Morris transaction. In procuring clearance of the California check, Armitage indorsed it, "Lewis Lexton Morris, as Administrator of the Estate of Ann Dye Morris, Deceased, heir-at-law. By Lewis Lexton (X) [his mark] Morris. Witness to mark: Gordon Armitage [and] Melba J. Haynie, Searcy, Ark. Gordon Armitage, Attorney."

With these endorsements Security Bank accepted the check February 27.[1] On March 26th Armitage

---

[1] A letter from Cox dated February 21 mentioned that the check was being sent to Armitage. A post script is: ". . . We have decided, upon advice of our bankers, not to indorse the Administrator's distributive share under the authority given in the power of attorney, but, on the other hand, to send it direct to the Administrator for his personal indorsement. We therefore hand you [the California check] . . . in the face amount of $4,742.03. . . . It is very likely that a certified copy of Letters of Administration will have to be produced when the check is presented for payment."

bought bonds for Morris' account. He testified that during the intervening twenty days "I had kept the $2,371.02 in my lock box."

Late in May, 1947, in a communication prepared by the law firm of Owen C. and Culbert L. Pearce, Morris complained to Armitage that of the sixty percent released by Cox [amounting to $5,790.44] he had received but $2,371.02. He mentioned that the attorney was entitled to a fee of $237.10; and demand was made for the remainder.

Armitage replied (May 31) in a letter addressed to Cul. L. Pearce. One of his statements was: "I have in my files a receipt from Lewis of all sums due him.[2] I

[2] Throughout the record "Louis" and "Lewis" appear, and the spelling in this opinion corresponds with usage at a particular time or place.

also have bonds that belong to him that no one [else] can cash, which were purchased for him on that basis." Armitage expressed a willingness to deliver the Securities to some responsible person, "[for] Lewis, in my opinion, has in the last year reached the point where he is not capable of looking after his best interests. . . ." A Court order directing Armitage to produce certain records found that on July 11 "the defendant deposited with the Clerk of the Probate Court U. S. Series E. bonds aggregating $3,150 face value, which he says he bought with funds belonging to plaintiff as Administrator."

Armitage testified that when he deposited $2,371.02 to Morris' credit March 8th "and obtained a like amount in cash," the receipt formerly referred to was prepared "for the full amount to be paid over." Armitage says that after Morris signed the receipt he told him "we" should buy bonds with the cash, but Morris refused to do so.

It is contended by Armitage that the Ann Morris estate was in process of administration in 1947, irrespective of the fact that in February 1945 a Court order had discharged the Administrator from bond liability, and had relieved U. S. F. & G. as surety. But assuming administration had not been closed, Probate

Court, as distinguished from Armitage personally or in his capacity as attorney, was the appropriate depository for the California check, or its proceeds.

It requires no citation of authority to sustain the proposition that an attorney is inconsistent when upon the one hand he treats his Administrator-client as competent to contract for a fee, competent to authorize payment from estate funds without a Court order, competent to make personal contracts relating to money not bound up with a sister's estate, but, upon the other hand, wholly incompetent to handle his own affairs, or to function in an official capacity judicially conferred.

The trial Court seemingly believed that unnecessary delays in making settlement, unauthorized indorsements, and a want of diligence in discharging professional duties, created a situation demanding legal action by Morris, and relieving him of further financial obligation to Armitage, irrespective of what the original contract may have been. We have the same views.

In his cross-complaint Armitage alleged that he had been charged with forgery, and otherwise libeled. The Court did not err in declining to award damages. Indorsement of Morris' name by mark was a subterfuge. Armitage insisted that as attorney he had general power to sign for his client. This is not the law. Mere existence of the relationship of attorney and client does not imply that the attorney has authority to sign a client's name to checks, drafts, or other negotiable paper. In the case at bar there was no need for the action taken. It was admitted that Morris could write. He filed a signature specimen, written in the Court's presence. The contract, and the power sent to Cox at the direction of Armitage, were signed by Morris. Melba Jo Haynie testified that Armitage asked her, as his secretary, to witness the mark; and, she said, "Morris wasn't in the office I was in." When asked why he took the receipt from Morris on March 8, Armitage replied, "I knew he wasn't competent to sign it then, [but] I took it just as a matter of record." In response to the question, "If you didn't think the receipt was any good, why did

you take it?" Armitage replied, "I don't know that I should answer that. . . ." Armitage did not contend that Morris authorized him to sign the check, by mark or otherwise.

In the light of this record the trial Court believed that, although a contract to pay ten percent was shown, services under it fell short of mutual intentions. Because of the breach Morris was entitled to the judgment rendered. The two California checks were, in a sense, treated as separate transactions, and since Morris was not injured by the diversion complained of when Cox was paid for the services rendered up to that time, the Chancellor's action on that part of the complaint will be affirmed.

In the cross-complaint Armitage alleged injuries as for libel. The matter to which he took exceptions, whether justified or not, was in a sense invited. It was a consequence of his refusal to coöperate. There was no evidence that the cross-complainant's reputation was injured, and at most no more than nominal damages could be awarded. The Court was correct, however, in finding for the cross-defendants on this issue, and the decree in its entirety will be affirmed. It is so ordered.