ARMITAGE *v.* BAR RULES COMMITTEE.

5-249                                    266 S. W. 2d 818

Opinion delivered April 12, 1954.

*W. H. Roth, G. P. Houston* and *Sam Rorex,* for appellant.

*John D. Eldridge, Jr.,* for appellee.

GRIFFIN SMITH, Chief Justice. We are asked to reverse the trial court's judgment that appellant—sometimes referred to as the respondent — should be permanently disbarred because of unprofessional conduct extending over a protracted period. Rules for the procedure were adopted April 24, 1939, under authority of Amendment No. 28 to the Constitution.

The motion for a new trial lists twenty-eight matters it is contended were erroneously disposed of by the trial judge.

The respondent's motion to make the complaint more definite and certain was granted, but a defense demurrer was overruled. Other preliminary phases were acted on

466

in a manner unsatisfactory to appellant, over his objections and exceptions. The general demurrer asserted that the complaint did not state facts sufficient to constitute a cause of action. By separate motion Armitage asked that factual issues be determined by a jury, Revised Statutes, Ch. 15; Ark. Stat's, § 25-407. The judge properly held that the old enactment had been superseded by Supreme Court Rules authorized by Amendment 28.

The amended complaint listed nine acts of misconduct — or, rather conduct in connection with cases in which Armitage, as an officer of the court, had transgressed professional propriety to such an extent that his reliability as an attorney had become impaired. Four of the counts were dismissed. The final judgment rests on the remaining five charges.

First, there is involved appellant's representation of Mrs. Irene Christy whose trip from Chicago to Searcy was admittedly for the purpose of procuring a quick divorce from George Christy. Directly related to the Christy case is appellant's conduct during hearings before the Bar Rules Committee. The record discloses affirmative acts of deception in an effort to discredit handwriting experts and sustain his contention that an unknown person who said he was Christy came to appellant's office and signed the appearance entry.

The second allegation is based upon the respondent's conduct in withholding money from a client, Mrs. Susan Hamilton.

Charge No. 3 involves attorney-client relations with L. L. Morris for whom Armitage collected a substantial sum of money and dealt with it in gross disregard of his professional obligations. See *Armitage v. Morris, Administrator*, 215 Ark. 383, 221 S. W. 2d 9.

Charge No. 4 relates to a divorce procured by Armitage for Alma Jean Farrar Topper in circumstances indicating that she was excused from coming to Arkansas. It also involved the attorney's behavior in handling money and settling an obligation on his own terms and in his own time, with a final substantial loss to the client.

In agreeing with appellants assignments 13, 14, and 15 in the motion for a new trial relative to the inadmissibility of the affidavit and deposition of George Christy and the decree and depositions in *Christy* v. *Christy,* the result reached by the trial judge is not affected. There was other evidence showing that Christy did not enter his appearance. It is sought to sustain the non-culpability of Armitage on the ground that he was imposed upon when a spurious document came into the record.

We are also of the view that proceedings before the Bar Rules Committee in which appellant and his witnesses participated are admissible; and this is true irrespective of the administration of an oath. This is not a criminal action. In holding that at trial proceedings before the Bar Rules Committee in which the appellant participated are admissible, much of the matter objected to reaches us in pertinent form free from convincing contentions that the defendant was not fairly treated. The Committee's creation and existence is this Court's determination that an impartial tribunal should consider complaints of professional misconduct, sift substantial accusations from charges based upon personal pique, disappointment, or prejudice, and then, in respect of serious implication, permit the attorney to explain the transaction and, when he so desires, bring witnesses before the committee to substantiate his position.

By this process minor professional deviations are disposed of justly without public embarrassment. But where, as here, the investigation resolves itself into a consideration of unethical deportment extending over a long period of time, and where every convenience available to the Committee is animated by a desire to establish probable facts and then to consider the respondent's explanations and the measure of justification they afford, the legal status of this record is much like proceedings before administrative agencies where factual issues are sifted by a body composed of experienced men selected because of professional fitness. In the case at issue the Committee members were chosen to inquire into the very things contemplated by this Court. To say that

essentials constituting these preliminary hearings are hearsay would in some instances defeat the broad purposes of Amendment 28 and our implementing rules.

Ordinarily we confine our review to things abstracted by the appellant—sometimes supplemented by the appellee. But where the litigating parties do not agree regarding the construction to be placed upon language of a witness, the effect of a document, or meaning that should attach to what the witnesses have said, the transcript is referred to. It sometimes happens that words are taken from their context and a meaning is imposed at variance from reasonable understanding if the entire sentence, paragraph, deposition, or the oral examination and cross-examination were considered.

Judge Audrey Strait, who heard the cause on exchange, made findings of facts and announced conclusions of law. The factual fabric as summarized by Judge Strait has been compared with the testimony, exhibits, pleadings, etc. We find a painstaking, thorough, and conservative review of the testimony. Little of value could be added by an independent presentation, hence the facts as recapitulated for the information of the respondent and the Committee are adopted as our own.

## JUDGE STRAIT'S FACTUAL FINDINGS.

*Christy v. Christy.*—The Court finds as a fact that on March 18, 1950, Irene Christy brought a suit for divorce in the White Chancery Court against her husband, George Christy. Irene Christy at the time of the filing of the action was living in Chicago, Ill. The record discloses that she went to the office of the defendant, Gordon Armitage, in Searcy, and that he was employed to represent her. Leon Brewer, whom she later married, was with her.

Irene Christy was visiting in Sidon [White county] on the trip resulting in a divorce decree, and she asserted that the defendant advised her to state that she had been a resident of Arkansas for 90 days. Both Irene Christy and Leon Brewer testified in the divorce case, but denied

certain statements therein contained. An entry of appearance purportedly signed by George Christy appeared in the record and a divorce decree obtained in favor of Irene Christy resulted, [in the procurement of which] a trip was made to Little Rock for the presentation of the case before Judge Frank Dodge. Subsequently George Christy, who lived in Chicago, was advised of the divorce proceeding by his wife in Arkansas, and upon receipt of this information . . . the Bar Rules Committee . . . started its investigation, which eventually resulted in the filing of the complaint with its charges of . . . unprofessional conduct upon the part of defendant, Gordon Armitage.

Mr. Howard Cockrill, [Secretary] of the Bar Rules Committee stated that when the defendant was asked to explain the purported forgery of the signature of George Christy to the entry of appearance, [Armitage's story was] that when Irene Christy employed him as her attorney, a man was introduced to him as George Christy, and that he [later] knew he had been imposed upon. Specimens of handwriting of Gordon Armitage and his wife were submitted the Bar Rules Committee, to determine, if possible, who had signed the name of George Christy to the entry of appearance. The specimens . . . were shown to handwriting experts, Feron and Walters, who, from the information and data before them, gave opinions to the effect that the signature of George Christy upon the entry of appearance was in the handwriting of Mrs. Gordon Armitage. Later, these opinions were repudiated by each of the two witnesses and error admitted, largely because of the . . . family characteristic in the handwritings of Mrs. Armitage and her son, Robert Armitage. Feron and Walters did not have specimens or samples of Bobby Armitage's handwriting when their first opinions were given.

When the conclusions of the handwriting experts were disclosed to defendant, in a second appearance before the Bar Rules Committee, he stated that he had an opinion as to who had written the signature of George Christy on the entry of appearance. He produced an

anonymous letter, purported to have been written to Armitage [and mailed from] Trumann, Arkansas. The envelope shows that it was dated April 23, 1951. He furnished to the Bar Rules Committee a photostatic copy of the purported anonymous letter. Later, defendant admitted authorship in that he dictated the form to his son, Bobby Armitage, who wrote the letter as introduced in his own handwriting. The record shows that when defendant was questioned by the Bar Rules Committee as to the authorship of the latter, he denied knowing who had written same. Later, when the true authorship was disclosed, defendant stated that in admitting knowledge of authorship he wanted to mislead or confuse the experts and to justify such action and conduct in the investigation being made by the Bar Rules Committee. He stated that he knew he was not under oath when he appeared and talked before the Bar Rules Committee about not knowing who wrote the anonymous letter, and that he wanted to test experts.

Subsequently, with the additional specimens of handwritings by Bobby Armitage and that contained in the anonymous letter, the matter was again submitted to Feron and Walters, who concluded and gave their opinion that in the light of this new evidence, the signature of George Christy on the entry of appearance was in the handwriting of Bobby Armitage, the son of defendant. The two expert witnesses were present and testified in person in the trial. Their testimony, while long, was impressive and the Court had an opportunity to observe the seriousness and sense of responsibility resting upon them in the testimony given. They frankly admitted erroneous opinions upon the exhibits and specimens originally before them to the effect that the signature of George Christy was in the handwriting of Mrs. Armitage. With enlarged pictures and charts of her handwriting, that of Gordon Armitage and of the signature on the entry of appearance, it was understandable that because of strong family resemblance in the handwritings, a mistake could have occurred. Both witnesses stated that subsequent to their original opinions, with all the speci-

mens of handwriting before them and with an enlarged record, by comparison in handwriting, which they explained at length, without doubt Bobby Armitage wrote and signed the name of George Christy to the entry of appearance. There is no contention upon the part of any person that George Christy actually signed the entry. The record shows he was not in Arkansas at the time.

The whole history surrounding this allegation showed falsehoods being incorporated in the depositions of Irene Christy and Leon Brewer—that the signature of George Christy was forged to the entry of appearance with the knowledge and connivance of defendant. The action and conduct of defendant after the investigations were instituted by the Bar Rules Committee, to determine the true facts, were intentionally misleading, as he himself stated. The explanation he made—that in appearing before the Bar Rules Committee he knew he was not under oath and sought because of such alleged fact to mistake the true circumstances surrounding the matter investigated—could not redound to his credit.

The Court finds and holds that the defendant was guilty of gross unprofessional conduct as an attorney in handling the Christy case, both in the procurement of the divorce as well as his attitude and conduct with reference to the investigation by the Bar Rules Committee.

*Mrs. Susan Hamilton.*—Plaintiff's testimony in this allegation consisted of two letters, or carbon copies thereof, referred to in the trial as Exhibits 38 and 39. The charge of unprofessional conduct upon the part of defendant is that having funds in his hands belonging to Mrs. Hamilton, he (without legal justification) withheld the payment of such money to her for an unreasonable length of time. The facts are brief and to the effect that defendant sold property which Mrs. Hamilton had acquired as a surviving tenant by entirety.

Mrs. Hamilton moved to California, and was apparently indebted to Armitage in the sum of $175.00 for prior legal services. When a purchaser of the lands was found, defendant prepared and forwarded to Mrs. Ham-

ilton a deed for execution, and advised her that he would account for all funds and expenses. The deed was executed and returned to defendant in November, 1948. Not having heard from the defendant about remitting the purchase money, a Mr. Scheller, an attorney for Mrs. Hamilton, wrote defendant, asking for remittance. He was told by Armitage that he had been ill, but was surprised that no acknowledgment had been made by Mrs. Hamilton of a check alleged to have been mailed to her. There was nothing adduced in the trial to indicate such a check had ever been sent.

Subsequently, Armitage mailed Mrs. Hamilton his check for $700.00 and promised to pay the balance within a short time. There was no further word from defendant for almost an eight-months period. Mr. Scheller then contacted the Bar Rules Committee, through Paul Gutensohn, an attorney of Ft. Smith. Defendant, resenting such inquiry by the Bar Rules Committee, consented to and did remit the balance to Mrs. Hamilton. His explanation for the delay in making remittance was based upon two reasons, (quoting from the notes made by the Court): First: Mrs. Hamilton "failed to coöperate with me in handling the place." Second: "Because I knew that the money would be spent as soon as she got it". Defendant took the position that the relationship of attorney and client did not exist between Mrs. Hamilton and himself, and that no legal charge of misconduct could be predicated upon the facts and circumstances of the allegations.

The conduct of defendant in withholding funds from Mrs. Hamilton until forced to make remittance by reason of employment of attorneys by Mrs. Hamilton, and the inquiry of the Bar Rules Committee, is not justified upon the grounds he relied upon as a defense. He was guilty of unprofessional conduct as an attorney without reference to the actual relationship as to attorney and client between himself and Mrs. Hamilton.

*Armitage v. Morris.*—The defendant in the complaint is charged with gross unprofessional conduct with

reference to his employment as an attorney for L. L. Morris.

The record discloses that Walter Morris, a brother of L. L. Morris and Ann Dye Morris, died intestate in 1943. Ann Dye Morris died in 1944. Lewis, or L. L. Morris [the same person] was appointed as administrator of the Ann Dye Morris Estate. Information subsequently came to L. L. Morris of his brother's death through W. C. Cox Company, an organization employed in investigating beneficiaries or claimants of interests in estates of deceased persons.

L. L. Morris contacted defendant, who approved the employment of W. C. Cox Company to help establish the claim of Morris. A representative of Cox came to Searcy and after some discussions, a contract was entered into with Cox and compensation for services agreed to. The evidence, not seriously disputed in any respect, shows that subsequent to the contract with Cox Company and the employment of defendant to advise and represent L. L. Morris, certain remittances were made of funds collected in California from the Walter Morris Estate.

On March 8, 1947, there was remitted to defendant a check from the Walter Morris Estate in the amount of $4,742.04. Armitage prepared a receipt which Louis Lexton Morris signed, dated March 9, 1947, in the sum of $4,742.04. Actually, (and it is not disputed) Morris received in cash the sum of $2,371.02. On or about March 25, following, U. S. Savings Bonds, Series E, were purchased in the name of Lewis Lexton Morris without his knowledge or consent. The bonds were apparently bought with funds which properly belonged to Lewis Lexton Morris as Administrator. They were placed in the safety deposit box of Armitage, so he said. Apparently Morris had no knowledge of the purchase of the bonds at that time. Later, when information came to him, demand was made for delivery of the bonds to Morris or Mr. Levitt as his agent. The demand was refused by defendant. Thereupon, suit was instituted to recover bonds, which was resisted. Also, involved was matter of compensation to be paid to the attorney for services.

The claim of Armitage was, by the Court, reduced and restitution of difference between the amount claimed and that found due ordered made. The evidence disclosed that as to the check dated February 13, 1947, payable in the sum of $4,742.03 to Lewis Lexton Morris, as Administrator of the Estate of Ann Dye Morris, such check was cashed by the defendant who affixing an "X" to the check, (admittedly by Armitage) without the knowledge or consent of L. L. Morris. As a result of the litigation by Morris against Armitage, the bonds were deposited into the registry of the Court.

It would be a matter of speculation to assume to state what was in the mind of defendant during the period of the handling of the collection of the funds from the Walter Morris Estate. He predicated his action and conduct upon the over-all theory that L. L. Morris was mentally incompetent and incapable of directly handling the funds due him or the estate of Ann Dye Morris.

As an attorney, he knew the proceedings that should have been pursued to properly and ethically follow the legal provisions of the law. His action in the drawing of the receipt for $4,742.03 from Morris when actually one-half only was paid Morris, cannot be excused or justified. The presumptious act of Armitage in affixing the signature of L. L. Morris to the check with an "X" was without authority and not justified. If, as defendant contended, Morris was incapable of handling his funds, and for such reason Armitage saw fit to invest one-half of the money in bonds, then why not the whole of the collection of $4,742.03? The idea that Court action had to be resorted to in adjusting the matter of collections and attorneys' fees is not such evidence of good faith as should be exhibited by an attorney toward his client. Under the facts, not seriously disputed, the Court finds that the defendant was guilty of unprofessional conduct toward L. L. Morris, as his client, not warranted nor justified under the facts and circumstances surrounding the whole case.

*Alma Jean Farrar Topper.*—Alma Jean Farrar obtained a divorce from Charles E. Farrar. The decree recited that Farrar was indebted to his wife in the sum of $927.50 and that this indebtedness would be paid within a reasonable time, the amount to be paid upon the refinancing of the farm or its sale. About two years later, in August, 1949, Armitage obtained a deed to this property—property dealt with in that divorce decree. On inquiry, Mrs. Farrar later learned of the sale and sought to collect her debt, which took about a year.

Defendant paid her $50.00 on this trip and offered to pay her $50.00 per month until he could refinance the debt. Later Mrs. Farrar employed an attorney to collect the indebtedness due her. In October, 1950, she received a net of $585.00. The evidence and record disclose that the deed from Charles Farrar was withheld from the record for a long period of time—until April 20, 1950, when Mrs. Gordon Armitage was permitted to record it as being a true copy of the original, filed for record November 22, 1949. Without enlarging on this phase of the case, suffice it to say that Mrs. Farrar was required to employ an attorney to collect the indebtedness due her under the divorce decree. As the Court views the evidence and record covering this controversy, it was incumbent upon defendant, in view of the relationship of attorney and client, and in his capacity as a fiduciary, (in that he purchased the lands originally referred to in a foreclosure proceeding) to diligently and without delay, see that Mrs. Farrar was paid.

So often truth creeps into the picture when least contemplated. Defendant introduced a letter in evidence, as Exhibit "T" addressed to Mrs. Farrar at Kennett, Missouri, dated November 4, 1947, in which he stated it would not be necessary for her to come down "here" (Searcy). He wrote: "P. S. It will not be necessary for you to come down. I will get the decree [divorce] in a few days and will forward same to you. This decree will be final from date it is granted." The caption to the depositions in the divorce proceedings shows that they were taken in Searcy on November 4, 1947. The certifi-

cate stated "That there was present at the examination Alma Jean Farrar, Gus Sims—and Gordon Armitage, who conducted the examination." On November 19, following, Mrs. Farrar wrote Armitage thanking him for handling the divorce. The discrepancy just referred to is not, of course, an allegation of professional misconduct, but it came into the picture unsought and is somewhat revealing in its aspects.

The Court finds as a fact from the evidence on the Farrar allegation, that the defendant was guilty of unprofessional conduct in the manner in which he handled the interest and debt due Mrs. Farrar.

PER CURIAM. It has long been the rule that a lawyer's unprofessional conduct subjects the practitioner to disciplinary action in some instances, and in others to permanent exclusion from the practice. In the case here the trial court found—from evidence of a convincing nature—that after inquiry had been undertaken by the Bar Rules Committee a planned policy of deception was pursued. It was not until ascertainment of the facts became inevitable that the respondent admitted the circuitous course he had adopted to mislead those who were judicially obligated to determine essential issues.

Our conclusions are that the judgment of permanent disbarment is justified, that the appellant was not prejudiced by procedural rulings, and that an affirmance is necessary. It is so ordered.